## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **STEPHANIE JONES**, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No.  4:23-cv-477 |
| v. | **CLASS ACTION COMPLAINT** |
| **BANKERS TRUST COMPANY**, | **JURY DEMAND** |
| Defendant. | |

Plaintiff Stephanie Jones ("Plaintiff"), brings this Class Action Complaint against Defendant Bankers Trust Company ("Defendant") and alleges as follows:

### INTRODUCTION

1.      This case concerns Defendant's unlawful business practice of assessing $33 Overdraft Fees ("OD Fees") on debit card transactions authorized on sufficient funds.

2.      These practices breach promises made in Defendant's Consumer Terms and Conditions (**Exhibit A** hereto), and, upon information and belief, the Overdraft Opt-In Form[1] (**Exhibit B** hereto, together with Exhibit A, the "Contract").

3.      Plaintiff and other customers of Defendant have been injured by Defendant's improper fee maximization practices. Plaintiff, individually and on behalf of the classes of individuals preliminarily defined below, brings claims for Defendant's breach of contract, including the duty of good faith and fair dealing.

---

[1] Federal regulators require banks and credit unions to use an overdraft opt-in form substantially similar to the model Form A 9 overdraft opt-in for ATM and one-time debit card transactions attached hereto as Ex. B. 12 C.F.R. § 1005.17(b)(1).

## PARTIES

4.      Plaintiff is a citizen of Iowa and a resident of this District. She has maintained a checking account with Defendant at all times relevant hereto.

5.      Defendant is a bank with nearly $6 billion in assets. It is a citizen of Iowa with its principal place of business in this District.  Defendant is engaged in the business of providing retail banking services to consumers at its 20 locations in Iowa and Arizona.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a State different from the Defendant. The number of members of the proposed Class in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

7.      This Court also has original jurisdiction under 28 U.S.C. §§ 1331 because this case involves a federal question as Plaintiff alleges violations of the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)).

8.      Furthermore, this Court has supplemental jurisdiction over Plaintiff's claims for breach of contract, including breach of the duty of good faith and fair dealing, because it is so related to Plaintiff's claim for violations of the Electronic Fund Transfers Act (Regulation E) that it forms part of the same case or controversy under Article III of the United States Constitution.

9.      This Court has personal jurisdiction over the Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters.

## BACKGROUND FACTS

11.    In 2021, the largest financial institutions in America charged customers almost $11 billion in OD Fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America* (The New York Times, Mar. 9, 2023), https://www.nytimes.com/2023/03/09/magazine/poverty-by-america-matthew-desmond.html.

12.    Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD Fees or Insufficient Funds Fees ("NSF Fees") entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

13.    Federal regulators have also taken action. For example, the Consumer Financial Protection Bureau (CFPB) recently fined Regions Bank $191 million, finding that it "acted unfairly and abusively" in violation of the Consumer Financial Protection Act of 2010 by assessing the same "surprise" APSN fees at issue here. CFPB, Enforcement Actions, Regions Bank (Sep. 28, 2022), *available at* https://www.consumerfinance.gov/enforcement/actions/regions-bank_2022 (last accessed Mar. 22, 2023).

14.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

I.    **DEFENDANT ASSESSES OD FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.**

15.    Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

16.    Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

17.    However, Defendant still assesses crippling $33 OD Fees on many of these transactions and mispresents its practices in the Contract.

18.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

19.    Defendant maintains a running account balance, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

20.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

21.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

22.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

23.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners

found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

24.     The CFPB again criticized the assessment of OD Fees on APSN Transactions in its

October 2022 circular, stating:

Even if a consumer closely monitors their account balances and carefully calibrates their spending in accordance with the balances shown, they can easily incur an overdraft fee they could not reasonably anticipate because financial institutions use processes that are unintelligible for many consumers and that consumers cannot control. . . .

For example, even when the available balance on a consumer's account—that is, the balance that, at the time the consumer initiates the transaction, would be displayed as available to the consumer—is sufficient to cover a debit card transaction at the time the consumer initiates it, the balance on the account may not be sufficient to cover it at the time the debit settles. The account balance that is not reduced by any holds from pending transactions is often referred to as the ledger balance. The available balance is generally the ledger balance plus any deposits that have not yet cleared but are made available, less any pending (i.e., authorized but not yet settled) debits. Since consumers can easily access their available balance via mobile application, online, at an ATM, or by phone, they reasonably may not expect to incur an overdraft fee on a debit card transaction when their balance showed there were sufficient available funds in the account to pay the transaction at the time they initiated it. Such transactions, which industry commonly calls "authorize positive, settle negative" or APSN transactions, thus can give rise to unanticipated overdraft fees.

6

. . .

Charging an unanticipated overdraft fee may generally be an unfair act or practice. Overdraft fees inflict a substantial injury on consumers. Such fees can be as high as $36; thus consumers suffer a clear monetary injury when they are charged an unexpected overdraft fee. Depending on the circumstances of the fee, such as when intervening transactions settle against the account or how the financial institution orders the transactions at the end of the banking day, consumers could be assessed more than one such fee, further exacerbating the injury. These overdraft fees are particularly harmful for consumers, as consumers likely cannot reasonably anticipate them and thus plan for them.

*Consumer Financial Protection Circular 2022-06: Unanticipated Overdraft Fee Assessment Practices*, Consumer Financial Protection Bureau 5-6 (Oct. 26, 2022), https://bit.ly/3SNPg69.

25.    There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

26.    But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

27.    Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

## A.  Mechanics of a Debit Card Transaction

28.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to

Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

29.    At this step, if the transaction is approved, Defendant immediately decrements the funds in an accountholder's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

30.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

31.    Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

32.    There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

### B. Defendant's Contract

33.    Plaintiff has a Defendant checking account, which is currently governed by the Contract. Ex. A-B.

34.    Defendant promises in its Contract that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. B.

35.     Defendant's Contract also states:

**Overdrafts** – You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later.

Ex. A at 3.

If a check, item or transaction is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item for insufficient funds (returned item).

*Id*. at 6.

36.     In breach of these promises, Defendant assesses $33 OD Fees when there is enough money in the account to cover the transaction. In other words, there are sufficient available funds to honor the item or transaction.

37.     Upon information and belief, Defendant further promises that authorization and payment occur simultaneously and that overdrafts will be determined at the time Defendant "authorize[s] and pay[s]" the debit card transaction:

We <u>do</u> ***authorize and pay*** for the following types of transactions:

- Checks and other transactions on your checking account number
- Automatic bill payments

We <u>do not</u> ***authorize and pay*** overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always ***authorize and pay*** any type of transaction.

If we do <u>not</u> ***authorize and pay*** an overdraft, your transaction will be declined*.*

…

What if I want [Institution Name] to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions?

If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions, call …

…

__ I <u>do not</u> want [Institution Name] to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

__ I want [Institution Name] to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

Ex. B (emphasis added).

38.     Upon information and belief, Defendant links payment to authorization ***eight times***, meaning that transactions are paid, and therefore overdrafts are determined, at authorization.

39.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Defendant assesses OD Fees on them anyway.

40.     The above promises indicate that transactions are only overdraft transactions when they are presented and approved into a negative account balance. Of course, that is not true for APSN Transactions.

41.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

42.     All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

43.     The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

44.     First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

45.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

46.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

47.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

48.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

49.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

50.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the

transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

51.    This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

52.    In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

53.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant never did here.

54.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

55.    Defendant and its accountholders make no such agreement. The Contract thus misleads and deceives accountholders.

### C. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

56.    Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

57.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit cards transactions work.

58.     Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they do not allow debt like credit cards as the money comes directly out of the checking account.

59.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://bit.ly/3v5YL62.

60.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

61.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

62.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca

Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

63.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



*Id.*

64.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id*. at 9.

65.    Ultimately, unclear and misleading fee representations like those in Defendant's Contract mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid . . . end up being hit by fees nonetheless." *Id*.

66.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not

incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

67.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

68.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

69.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

### D.  Plaintiff Was Assessed an OD Fee on Debit Card Transactions Previously Authorized on Sufficient Funds

70.     On November 18, 2022, and May 8, 2023, Plaintiff was assessed $33 OD Fees on debit card transactions that settled that day, even though the transactions had been previously authorized on sufficient funds.

71.     Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover the transactions and should not have been assessed these fees.

72.     The improper fees charged by Defendant were also not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

73.     Plaintiff therefore had no duty to report the fees as errors because they were not errors, but the fees were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

74.     Moreover, any such reporting would have been futile because Defendant's own contract admits that Defendant made a decision to charge the fees.

## II.    THE IMPOSITION OF UNAUTHORIZED FEES BREACHED DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING.

75.     Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are vested with a discretionary power over the other party. Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has been adopted by all states—mandates good faith and fair dealing. As such, when a party such as Defendant gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Defendant is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Defendant has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

76.     Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant provided itself with numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abused that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged OD Fees on transactions that did not cause an overdraft.

77.     Defendant exercised its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it defined contractual terms in a way that directly led to more fees that consumers could not reasonably anticipate. Further, Defendant abused the power it had over customers and their bank accounts and acted contrary to their reasonable expectations under the

Contract. This is a breach of Defendant's implied covenant to engage in fair dealing and act in good faith.

78.    It was bad faith and entirely outside Plaintiff's reasonable expectation for Defendant to use its discretion to assess OD Fees on transactions that did not overdraw the account.

## CLASS ACTION ALLEGATIONS

79.    Plaintiff brings this action individually and as a class action on behalf of the following proposed class:

> All Defendant accountholders who, during the applicable statute of limitations, were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

80.    Excluded from the Class is Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

81.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, if necessary, before this Court determines whether certification is appropriate.

82.    The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

83.    The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

84.    The claims of Plaintiff are typical of the claims of the Class in that Plaintiff, like all members of the Class, was charged improper fees as set forth herein. Plaintiff, like all members of

the Class, has been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Class and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Class. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Class.

85.    There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual members of the Class.

86.    Among the questions of law and fact common to the Class include:

  a.  Whether Defendant charged $33 OD Fees on APSN Transactions;

  b.  Whether these fee practices breached the Contract and the duty of good faith and fair dealing;

  c.  Whether Defendant violated Regulation E;

  d.  The proper method or methods by which to measure damages; and

  e.  The declaratory and injunctive relief to which the Class is entitled.

87.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

88.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defendant's misconduct will proceed without remedy.

89.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

90.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all Class members, is at risk of additional improper fees. Plaintiff and the Class members are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

## FIRST CLAIM FOR RELIEF
### Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing

91.    Plaintiff incorporates by reference the preceding paragraphs.

92.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's Contract. Exs. A-B.

93.    All of Defendant's account holders, including Plaintiff and the members of the Class, are subject to the Contract.

94.    All contracts entered by Plaintiff and the Class are identical or substantively identical because Defendant's form contracts were used uniformly.

95.    Defendant misconstrued in its Contract its true OD Fee practices and breached the express terms of its Contract.

96.   No Contract provision authorizes Defendant to charge OD Fees on transactions that do not actually overdraw the account.

97.   Defendant breached the terms of its Contract by charging OD Fees on transactions that do not actually overdraw the account.

98.   Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

99.   Under Iowa law, good faith is an element of every contract between banks and/or credit unions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

100.   Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

101.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

102.   Defendant abused the discretion it granted to itself when it charged OD Fees on transactions that do not actually overdraw the account.

103.   In these and other ways, Defendant violated its duty of good faith and fair dealing.

104.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Class.

105.    Plaintiff and members of the Class have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Violation of Electronic Fund Transfers Act (Regulation E)**
**C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq*.))**
**(On Behalf of Plaintiff and the Class)**

106.    Plaintiff incorporates by reference the preceding paragraphs.

107.    By charging overdraft fees on APSN Transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

108.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).)

109.    To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and

truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

110.    The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

111.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

112.    Because Defendant failed to use a Regulation E complaint opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions. Plaintiff and members of the Class have been harmed by Defendant's practice of assessing OD Fees on one-time debit card and ATM transactions when, under Regulation E, Defendant did not have authority to do so.

113.    As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class.

114.    Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

a. Certify this case as a class action, designating Plaintiff as class representative and designating the undersigned as Class Counsel;

b. Award Plaintiff and the Class actual damages in an amount according to proof;

c. Award Plaintiff and the Class restitution in an amount to be proven at trial;

d. Award Plaintiff and the Class pre-judgment interest in the amount permitted by law;

e. Award Plaintiff and the Class attorneys' fees and costs as permitted by law;

f. Declare Defendant's practices outlined herein to be unlawful and a breach of contract;

g. Enjoin Defendant from engaging in the practices outlined herein to the extent the breach the Contract;

h. Grant Plaintiff and the Class a trial by jury;

i. Grant leave to amend these pleadings to conform to evidence produced at trial; and

j. Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Dated:  November __, 2023              Respectfully submitted,

_____
Roxanne Barton Conlin
**ROXANNE CONLIN & ASSOCIATES, P.C.**
3721 SW 61st Street, Suite C
Des Moines, IA 50321
Phone: 515.283.1111
Fax: 515.282.0477
Roxanne@roxanneconlinlaw.com

David M. Berger (*pro hac vice* forthcoming*)*
Erin A. Barlow (*pro hac vice* forthcoming)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Fax: (510) 350-9701
dmb@classlawgroup.com
eab@classlawgroup.com

Shawn K. Judge (*pro hac vice* forthcoming)
Mark H. Troutman (*pro hac vice* forthcoming)
**GIBBS LAW GROUP LLP**
1554 Polaris Parkway, Suite 325
Columbus, Ohio 43240
Telephone: (510) 350-9700
Fax: (510) 350-9701
skj@classlawgroup.com
mht@classlawgroup.com

Lynn A. Toops (*pro hac vice* forthcoming)
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: 317-636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV (*pro hac vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gstranch@stranchlaw.com

*Attorneys for Plaintiff and the Putative Class*